**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Guy Kezirian,

Plaintiff,

v.

World College of Refractive Surgery and Visual Sciences PBC, a Delaware Public Benefit Corporation; Charles Williamson, an individual; Arthur B. Cummings, an individual; Osama Ibrahim, an individual; Dan Z. Reinstein, an individual; Ik Hee Ryu, an individual; Doe Defendants 1 through 50,

Defendants.

No. CV-25-04249-PHX-SHD

**ORDER**

Pending before me are four related motions. Plaintiff Guy Kezirian filed a motion to strike Defendants' supplement to the state court record and to vacate the termination of Defendant Osama Ibrahim ("Motion to Strike"). (Doc. 15.) Defendants are World College of Refractive Surgery and Visual Sciences PBC ("World College") and five of its board members, Charles Williamson, Arthur B. Cummings, Osama Ibrahim, Dan Z. Reinstein, and Ik Hee Ryu (the "Director Defendants"). Defendants oppose the Motion to Strike and, in the alternative, cross-move to adopt the Maricopa County Superior Court's partial dismissal of Ibrahim ("Cross-Motion"). (Doc. 17.) Defendant Cummings moves to dismiss for lack of personal jurisdiction and improper venue ("Cummings's Motion to Dismiss"). (Doc. 10.) Defendants Reinstein and Ryu jointly move to dismiss on the same

grounds ("Reinstein and Ryu's Motion to Dismiss").[1] (Doc. 8.) The motions are fully briefed. (Docs. 11, 12, 17, 18, 19.)[2] For the reasons below, the Motion to Strike will be granted, the Cross-Motion will be denied, and the Motions to Dismiss will be granted.

## I. BACKGROUND

Kezirian brought this action in the Superior Court of Arizona, Maricopa County, against World College and several members of its board of directors. (Doc. 1-1 at 364.) Kezirian, the founder and former director of World College, alleges that the individual Director Defendants sought to oust him and published false accusations of corporate deceit and stock-ownership fraud to over ninety shareholders worldwide across a video recording and three follow-up communications. (*Id*. at 365, 377–386.) The alleged defamatory statements were first made at a video-recorded meeting of the Director Defendants on May 30, 2024. (Doc. 1-1 at 379.) On June 2, 2024, an email sent from Cummings's email address and signed by each Director Defendant circulated the recording to more than ninety World College shareholders worldwide. (*Id*. at 381–382.) Kezirian alleges that Williamson later sent two further defamatory communications, a June 7, 2024 email and an August 8, 2024 letter. (*Id*. at 384–385.) He alleges that these communications damaged his reputation and caused third-party business partners in Arizona to strip him of valuable business equity and file a related lawsuit against him. (*Id*. at 365, 370, 386–387, 389–390.) He filed the original complaint on August 26, 2024, and the operative First Amended Complaint ("FAC") on April 18, 2025. (*Id*. at 364.)

## II. MOTION TO STRIKE AND CROSS-MOTION TO ADOPT

On July 14, 2025, while the case was pending in state court, Ibrahim entered a limited appearance, moved to set aside an application for entry of default, and alternatively moved to dismiss. (*Id*. at 703–720.) On November 14, 2025, Reinstein removed the action

---

[1] Cummings's Motion to Dismiss and Reinstein and Ryu's Motion to Dismiss will be referred to collectively as the "Motions to Dismiss."

[2] The parties did not request oral argument, and it is not necessary, so these motions are decided without holding a hearing. *See* LRCiv 7.2(f).

to federal court and filed a copy of the notice of removal in the Superior Court. (Doc. 1.) On November 19, 2025, the Clerk of the Superior Court filed a minute entry dated November 10, 2025 ("November 19 Minute Entry"), in which the Superior Court Judge concluded that the FAC's allegations did not establish that Ibrahim purposefully directed any conduct at Arizona and dismissed him for lack of personal jurisdiction. (Doc. 7-1 at 2–4.) On November 20, 2025, Defendants filed a Supplement to State Court Record ("Supplement") asserting that the November 19 Minute Entry is part of the state-court record and should be incorporated into the record in federal court. (Doc. 7.) The Clerk of Court thereafter terminated Ibrahim from the federal court docket. Kezirian moves to strike Defendants' Supplement, (Doc. 7), and to vacate Ibrahim's termination. (Doc. 15.)

**A. Legal Standard**

A motion to strike is appropriate when authorized by statute or rule or when the motion seeks to strike a filing that is prohibited by statute, rule, or court order. LRCiv 7.2(m)(1). Under 28 U.S.C. § 1446(d), the filing of a notice of removal in the state court "shall effect the removal and the state court shall proceed no further unless and until the case is remanded." Upon the filing of the notice, the state court loses jurisdiction over the case. *Resol. Tr. Corp. v. Bayside Developers*, 43 F.3d 1230, 1238 (9th Cir. 1994). State court actions taken after removal have no legal effect. *Shupe v. Cricket Commc'ns, Inc.*, 2014 WL 119458, at *4 (D. Ariz. Jan. 14, 2014). Once a case is removed, the federal court "takes the case up where the State court left it off." *Jenkins v. Commonwealth Land Title Ins. Co.*, 95 F.3d 791, 795 (9th Cir. 1996) (citation omitted).

Federal courts look to the law of the rendering state to determine the effect of a state court's orders and judgments. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 373 (1996). The Arizona Rules of Civil Procedure provide that "minute entries, orders, and other court-generated documents are entered on the date they are filed by the clerk." Ariz. R. Civ. P. 6(d). The Arizona Supreme Court has long held the same: that "it is immaterial when the order or judgment was announced or ordered" and that the filing is "not effective until it was entered in the docket." *Harbel Oil Co. v. Steele*, 301 P.2d 757,

758 (Ariz. 1956).

**B. Discussion**

Kezirian argues that the November 19 Minute Entry (the "Partial Dismissal") should be stricken from the record because (1) 28 U.S.C. § 1446(d) divested the state court of jurisdiction on November 14, 2025, so the minute entry filed on November 19, 2025 is void, and (2) the minute entry is not a valid judgment under the Arizona Rules of Civil Procedure. (Doc. 15 at 1–5.) Defendants respond that the state court "issued" the dismissal on November 10, 2025, four days *before* removal to federal court on November 14, and that the Superior Court Clerk's November 19 docket entry was a purely ministerial act that § 1446(d) does not prohibit. (Doc. 17 at 5–8.) In the alternative, Defendants ask me to adopt the Superior Court's dismissal under the "law of the case" doctrine or as a matter of judicial economy. (*Id.* at 10–12.)

**1. "Issuing" of the Dismissal**

The parties agree that, after November 14, 2025, § 1446(d) barred the state court from taking any action in this case. (Doc. 15 at 2; Doc. 17 at 4; Doc. 19 at 2.) They disagree about when the state court's dismissal of Ibrahim took effect. Defendants argue that the Superior Court "issued" the dismissal on November 10, 2025, before removal, and that only a ministerial docketing step occurred afterward. (Doc. 17 at 4–6.) Kezirian contends that the dismissal became effective only when the clerk entered it on November 19, 2025, after removal. (Doc. 15 at 2–5; Doc. 19 at 2–3.) Kezirian is correct.

As explained above, an Arizona minute entry is entered, and becomes effective, on the date the clerk files it. Ariz. R. Civ. P. 6(d); *Harbel Oil*, 301 P.2d at 758. The November 10 date at the top of the minute entry is immaterial to the § 1446(d) analysis. The minute entry is unsigned, no hearing preceded it, and nothing in the record explains what the November 10 date represents. (Doc. 7-1; Doc. 19 at 3–4.) The only record of the dismissal on the state-court docket is the clerk's November 19 entry. (Doc. 15-1 at 4.)

The Superior Court's dismissal of Ibrahim, therefore, did not take effect until the clerk entered the minute entry on November 19, 2025. Because that date falls after the

November 14, 2025 removal, the minute entry was entered after the Superior Court lost jurisdiction.

**2. Ministerial-Act Exception**

Defendants next argue that § 1446(d) does not prohibit "ministerial acts that do not affect the merits of the dispute between the parties," and that the clerk's November 19 entry was such an act. (Doc. 17 at 4–7.) Defendants cite no Ninth Circuit authority recognizing that exception. They instead rely on a Sixth Circuit decision, *Lawrence v. Chancery Ct. of Tenn.*, 188 F.3d 687, 692–93 (6th Cir. 1999), and on a District of Utah decision, *Pebble Creek Homes, LLC v. Upstream Images, LLC*, 547 F. Supp. 2d 1214, 1218 (D. Utah 2007). (*Id.* at 5–7.) Neither case is binding.

I need not decide whether the Ninth Circuit would adopt the ministerial exception because it applies only to acts that do not affect the adjudication of the parties' dispute. *See Lawrence*, 188 F.3d at 692–93; *Pebble Creek Homes*, 547 F. Supp. 2d at 1218. The clerk's November 19 entry does not fit that description because it affected the merits of this dispute by dismissing a defendant. Before the entry, nothing had been decided on the record: no hearing was held, and the Superior Court made no ruling in open court. (Doc. 19 at 3–4.) The entry therefore did not record a decision that already had legal effect, but rather, it produced the effect of dismissing Ibrahim from the case. An act that removes a party from a case affects the adjudication of the dispute and is not ministerial. Because the minute entry was entered after removal and has no effect under § 1446(d), the Supplement, (Doc. 7), will be stricken. The Superior Court's dismissal of Ibrahim is therefore void.[3]

**3. Defendants' Alternative Cross-Motion**

Defendants ask that, if I grant the Motion to Strike, I still adopt the Superior Court's Partial Dismissal of Ibrahim. (Doc. 17 at 10–12.) They give two grounds: that the "law of the case" doctrine applies; and that the Partial Dismissal is correct, persuasive, and reflects the investment of substantial state-court resources, such that declining to adopt it would

[3] Because I grant the Motion to Strike under § 1446(d) based on the timing of the Minute Entry, I decline to address Kezirian's alternative Rule 54(b) argument.

contravene Federal Rule of Civil Procedure 1. (*Id.*) Because neither ground justifies adopting the ruling, the Cross-Motion will be denied.

Under the "law of the case" doctrine, when a court decides a rule of law, that decision should continue to govern the same issues in later stages of the same case. *Arizona v. California*, 460 U.S. 605, 618 (1983). Defendants argue that the Superior Court decided that it did not have personal jurisdiction over Ibrahim, and that that decision should now govern. (Doc. 17 at 10.) But, as discussed above, because the Superior Court lacked authority to issue the Partial Dismissal, it is void and has no legal effect. There is therefore no operative decision to which the law-of-the-case doctrine can attach.

Defendants also argue that the Partial Dismissal is "correct," "highly persuasive," and "the product of the State Court's considerable time, effort, and judicial resources," and that declining to adopt it would permit "what is tantamount to a horizontal appeal" and an "unnecessary duplication of effort" contrary to Federal Rule of Civil Procedure 1. (Doc. 17 at 11–12 (citing *Castro v. Exec. Tr. Servs., LLC*, 2009 WL 1459180, at *2 (D. Ariz. May 26, 2009)).) I do not doubt that the Superior Court devoted substantial resources to the question. But the issue here is not whether the Superior Court's reasoning was thorough. It is whether I should treat as dispositive a ruling that the Superior Court lacked jurisdiction to enter. Whether I have personal jurisdiction over Ibrahim is a question I should decide on a properly filed and fully briefed motion. No such motion is before me, and I express no view on such a motion's merits.

## III. MOTIONS TO DISMISS

Reinstein, Ryu, and Cummings move to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and under Rule 12(b)(3) for improper venue. (Docs. 8, 10.) Because I dismiss for lack of personal jurisdiction under Rule 12(b)(2), and do not give Kezirian leave to amend, I decline to address the parties' arguments as to venue.

### A. Personal Jurisdiction

#### 1. Legal Standard

A defendant may move to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2). The plaintiff bears the burden of establishing that jurisdiction is proper. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). The plaintiff cannot simply rest on the bare allegations of its complaint, but "uncontroverted allegations in the complaint must be taken as true." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011). Conflicts between the parties' evidence over jurisdictional facts must be resolved in the plaintiff's favor. *Id.*

In deciding a Rule 12(b)(2) motion on written materials, a court may consider evidence outside the pleadings, including affidavits and declarations. *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). Uncontroverted allegations must be taken as true, *Schwarzenegger*, 374 F.3d at 800, and "if both sides submit affidavits, then conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor." *LNS Enters. LLC v. Cont'l Motors, Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (citation modified). The plaintiff's documents "are construed in the light most favorable to the plaintiff." *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990). Ultimately, "if a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Data Disc*, 557 F.2d at 1285.

Arizona's long-arm rule permits the exercise of personal jurisdiction to the extent permitted by the Constitution. Ariz. R. Civ. P. 4.2(a); *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017). Personal jurisdiction may be general or specific. General jurisdiction permits a court to hear any claim against a defendant, regardless of whether the claim arises from the defendant's forum-related conduct. *Ford Motor Co. v. Montana Eighth Jud. District Court*, 592 U.S. 351, 358 (2021). That broad authority exists only where the defendant's affiliations with the forum are so continuous and systematic as to render the defendant "essentially at home" there. *Id.*; *Daimler AG v. Bauman*, 571 U.S.

117, 137–39 (2014). For an individual, the paradigm forum for general jurisdiction is the individual's domicile. *Daimler*, 571 U.S. at 137.

Specific jurisdiction is narrower. It permits a court to hear claims that arise from or relate to the defendant's contacts with the forum. *Ford*, 592 U.S. at 358–59. To establish specific jurisdiction, the plaintiff must show that the defendant purposefully directed activities toward, or purposefully availed himself of the privilege of conducting activities in, the forum and that the claims arise out of or relate to those forum contacts. *Id*. at 359–363; *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750–51 (9th Cir. 2025).

The Ninth Circuit applies a three-part test to determine whether a defendant is subject to specific jurisdiction: (1) the defendant must purposefully direct his activities toward the forum, or purposefully avail himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must arise out of or relate to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable. *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015); *Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden on the first two prongs. If the plaintiff satisfies them, the burden shifts to the defendant to present a "compelling case" that the exercise of jurisdiction would be unreasonable. *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985)).

**2. Discussion**

Cummings, the President of World College, is a citizen of Ireland and lives in Dublin. (Doc. 10 at 2; Doc. 1-1 at 366.) Reinstein, a member of World College's Board of Directors, is a citizen of the United Kingdom, and Ryu, a World College Board Member, is a citizen of the Republic of Korea. (Doc. 8 at 2.) Cummings, Reinstein, and Ryu (collectively, "Movants") each allege that they do not live or conduct business in Arizona. (Doc. 8 at 10; Doc. 10 at 2.) Kezirian does not argue that Movants are at home in Arizona, (*see* Docs. 11, 18), and nothing in the record suggests they are. I therefore conclude that Movants are not subject to general personal jurisdiction in Arizona. Thus, the issue is

whether they are subject to specific personal jurisdiction.

Because Kezirian's claims sound in tort, I apply the "purposeful direction" framework used for tort claims, rather than the "purposeful availment" standard used for contract claims. *Schwarzenegger*, 374 F.3d at 802. The applicable framework asks whether the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. *Picot*, 780 F.3d at 1214. An intentional act is an external manifestation of the actor's "intent to perform an actual, physical act in the real world." *Picot*, 780 F.3d at 1214 (quotation marks omitted). Movants argue that Kezirian has not satisfied any of the three elements of the purposeful direction test. (Doc. 8 at 6–9; Doc. 10 at 7.) Because personal jurisdiction must be established as to each defendant individually, I analyze specific jurisdiction as to each Movant separately. *See Calder v. Jones*, 465 U.S. 783, 790 (1984). As set forth below, Kezirian fails to satisfy the three-part purposeful direction test. I therefore do not address the other two prongs of the overarching specific jurisdiction test.

a. <u>Reinstein and Ryu's Motion to Dismiss</u>

*i. Intentional act*

Reinstein and Ryu characterize the FAC as alleging only that they approved or ratified statements written and sent by others, merely because they sat on the Board, (Doc. 8 at 3, 7), and assert that the FAC fails to allege any intentional act by them. Their characterization misstates the FAC. Kezirian does not rest his allegations solely on these Movants' board membership, but rather, he alleges that Reinstein and Ryu, along with other Director Defendants, attended and participated in a video-recorded meeting on May 30, 2024, at which the allegedly defamatory accusations were made. (Doc. 1-1 at 379.) He further alleges that on June 2, 2024, World College and each Director Defendant emailed the recording of that meeting to more than ninety shareholders. (*Id*. at 381.) He also alleges that the email was sent from Cummings's email address and signed by each Director Defendant. (*Id*. at 381–382.)

Participating in a meeting, sending an email, and signing a communication are each

deliberate acts. *See Schwarzenegger*, 374 F.3d at 806 (defining an intentional act under the *Calder* effects test as an “intent to perform an actual, physical act in the real world,” such as writing or publishing a communication). At this stage, Kezirian has satisfied the first purposeful-direction element as to the May 30 meeting and the June 2 email.

The same, however, cannot be said of the later communications. In the FAC, Kezirian alleges that the June 7 email and the August 8 letter were authored and sent by Williamson. (*Id.* at 384–385.) Kezirian’s allegations that the other Director Defendants, including Reinstein and Ryu, “acted in concert,” “conspired,” and “ratified” those statements, (*id.* at 366–367, 369, 384, 390), are conclusory and do not describe anything a particular Movant did. Board membership is a status, not an act. *See Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520–521 (9th Cir. 1989) (holding that personal jurisdiction over corporate officers and directors cannot rest merely on corporate association or contacts, but requires individual minimum contacts).

For the same reason, Kezirian’s allegations that World College has “continuous and systematic” Arizona contacts and that Defendants are each other’s alter egos, (Doc. 1-1 at 367–369), cannot supply the individual contacts required for Reinstein and Ryu. Alter-ego status requires such a unity of interest and ownership that the separate personalities of the entities no longer exist, and that failing to disregard the separation would produce a fraud or injustice. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015). Kezirian alleges that Defendants are each other’s alter egos, that there is a unity of interest in ownership and control among them, that they are a “mere shell instrumentality,” and that they disregarded corporate formalities, intermingled assets, and evaded liability. (Doc. 1-1 at 367–368.) Those allegations are a formulaic recitation of the alter-ego elements, and Kezirian pleads no facts supporting them. He alleges that each Director Defendant signed the Stockholder’s Agreement as a shareholder, (*id.* at 368), but he does not allege particular details about Reinstein’s or Ryu’s ownership or control. Nor does he allege any fact showing that the corporate form was used to perpetrate a fraud or injustice. Conclusory allegations of this kind cannot establish alter-ego status, and corporate position alone does

not subject a director to specific jurisdiction. *Davis*, 885 F.2d at 520–521.

*ii. Expressly aimed*

Having determined that the May 30 meeting and the June 2 email meet the intentional act element, the next question is whether Reinstein and Ryu's conduct was expressly aimed at Arizona. The express-aiming element requires more than a defendant's awareness that his conduct may cause some foreseeable effect in the forum. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006). And the inquiry focuses on the defendant's own contacts with the forum itself, not on the plaintiff's connection to the forum. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Thus, courts consider whether the relationship arose out of contacts the defendant himself created with the forum, as opposed to contacts created by the plaintiff, and whether the contacts are with the state itself rather than merely with persons who reside there. *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1143–1144 (9th Cir. 2017). A foreseeable injury in the forum, without more, is insufficient. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017).

Kezirian argues that the June 2 email, which he alleges was sent from Cummings's email address, was purposefully directed at Arizona. That email was distributed broadly to more than ninety World College shareholders worldwide and accused Kezirian of concealing his stock ownership. (Doc. 1-1 at 365, 381–382.) Kezirian alleges that these statements could reach his "professional colleagues and business associates," as well as "the entire industry of refractive surgery," (*id.* at 385), and that these statements caused him harm, including a rescinded donation to a global charity that he founded and chaired and cancelled events in Montreal, Vancouver, and Barcelona, (*id.* at 386–387). Despite its broad distribution, Kezirian argues that he has established the express aiming element by showing that the email concerned an Arizona resident and was sent to two Arizona shareholders who later took legal action against him—Matthew Hammond and Michael Herion. (Doc. 1-1 at 369–370; Doc. 11 at 2–5.)

As a preliminary matter, Reinstein and Ryu submit declarations from Hammond and Herion saying they did not receive the emails. (Doc. 8 at 11.) Kezirian responds that the

declarations say only that each was not "a recipient" of certain emails, that they do not address the June 2 email Cummings sent, and that, in a separate lawsuit, the Arizona plaintiffs attached and quoted the emails. (Doc. 11 at 2, 5 n.4.) He also alleges that his business partners "received copies of the defamatory statements from the [World College] Director Defendants." (Doc. 1-1 at 386–387.) Because conflicts between the parties' evidence over jurisdictional facts must be resolved in Kezirian's favor, *Mavrix*, 647 F.3d at 1223, I assume for purposes of these motions that Hammond and Herion received the June 2 email.

Although it is a close call, even with that assumption, Kezirian has not established express aiming. This case is similar to *Axiom Foods*, which involved an employee of a United Kingdom company who sent a single promotional newsletter containing the plaintiffs' logos to 343 addresses. 874 F.3d at 1067. Most recipients resided in Western Europe, and no more than ten were in California. *Id*. The Ninth Circuit agreed that sending the newsletter was an intentional act, but it held that the defendant had not expressly aimed that act at California. *Id*. at 1069–1071. The court looked to "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," and concluded that sending "one newsletter to a maximum of ten recipients located in California, in a market where [the defendant] has no sales or clients" "barely connected [the defendant] to California residents, much less to California itself." *Id*. at 1070–1071. The plaintiffs' evidence that the defendant knew of their California ties did not change the result, because a theory of individualized targeting does not, on its own, support specific jurisdiction. *Id*. at 1069–1070.

Like the newsletter in *Axiom Foods*, the June 2 email was a single electronic communication sent to a large, geographically dispersed group: more than ninety shareholders worldwide, of whom only two are alleged to be in Arizona. Kezirian points to no allegation that Reinstein or Ryu chose those recipients because they were in Arizona, or that either has customers, business, or other activity in Arizona. The email's subject, namely, whether Kezirian concealed his stock ownership in a Delaware public benefit

corporation, concerns the corporation's internal affairs rather than anything particular to Arizona. That the recipients here were shareholders on a known list does not make a difference. Thus, the question of whether Reinstein and Ryu's own conduct "connects [them] to the forum in a meaningful way," *Walden*, 571 U.S. at 290, must be answered in the negative.

Kezirian asserts that statements that "target and injure an Arizona resident" are "necessarily directed at Arizona." (Doc. 11 at 2.) The Court in *Walden* rejected that reasoning, however, holding that "the plaintiff cannot be the only link between the defendant and the forum." 571 U.S. at 285. It is not enough that Reinstein or Ryu allegedly "knew or reasonably should have known" the email would harm an Arizona resident. (Doc. 1-1 at 370.) Foreseeability alone does not suffice. *Axiom Foods*, 874 F.3d at 1069–1070.[4]

The May 30 meeting does not change the analysis. Kezirian alleges that the Director Defendants attended and participated in a video-recorded meeting at which the allegedly defamatory accusations were made. (Doc. 1-1 at 379.) He does not allege that Reinstein or Ryu convened the meeting, that it was held in Arizona, or that it was specifically directed at an Arizona audience. Statements made at a meeting of a company's directors about its founder are connected to Arizona only through the founder's residence, which cannot alone establish express aiming. *Walden*, 571 U.S. at 285, 290. And the recording reached shareholders only when it was emailed on June 2, which, as explained above, does not satisfy the express aiming element.

Put simply, Kezirian's Arizona domicile and the incidental residency of two

[4] Kezirian's reliance on cases that predate *Walden* to establish express aiming, (Doc. 18 at 9–10), ignores *Walden*'s holding. Additionally, *Walden's* description of *Calder* makes clear that the latter is distinguishable. In *Calder*, the Supreme Court found express aiming towards California by journalists residing in Florida who "wrote an article for publication in California that was read by a large number of California citizens," *Walden*, 571 U.S. at 288, and "knew the National Enquirer had its largest circulation in California, and that the article would have a potentially devastating impact there," *id.* at 288 & n.7 (cleaned up). Here, there are no similar allegations that Reinstein and Ryu's alleged intentional acts were expressly aimed at Arizona.

recipients of the June 2 email reflect the connections of others, not contacts that Reinstein and Ryu themselves created with Arizona. *Walden*, 571 U.S. at 284–286. Accordingly, the district court lacks personal jurisdiction over those Movants.[5]

*iii. Harm suffered in the forum*

The third purposeful direction element asks whether the defendant's conduct caused harm that he knew was likely to be suffered in the forum. *Picot*, 780 F.3d at 1214. Kezirian alleges that the defamatory statements caused his business partners in Physician Equity Holdings, LLC ("PEH")—a holding company Kezirian created and ran beginning in 2019—to exercise an option in the operating agreement to acquire all of his equity, which had grown to a value of more than $5 million, and then to sue him. (Doc. 1-1 at 370, 387.) He asserts that Reinstein and Ryu should have foreseen that their statements would reach his professional community in Arizona. (Doc. 18 at 13.) That harm, however, resulted from the independent decisions of third parties. Kezirian does not allege that Reinstein or Ryu—British and Korean citizens living abroad—knew of PEH or that Kezirian would suffer harm in Arizona. In any event, foreseeability alone is not enough. *Axiom Foods*, 874 F.3d at 1070.

b. <u>Cummings's Motion to Dismiss</u>

*i. Intentional act*

Kezirian alleges that Cummings attended and spoke at the May 30 meeting, and that the June 2 email was sent from Cummings's email address and signed by him. (Doc. 1-1 at 379–382). Speaking at a meeting and sending an email are deliberate acts. *See Schwarzenegger*, 374 F.3d at 806. The first purposeful-direction element is therefore satisfied as to the May 30 meeting and the June 2 email. In the FAC, Kezirian attributes

---

[5] Kezirian's remaining ties to Arizona do not change this result. In the FAC, he alleges that World College used a Scottsdale address through at least June 2024. (Doc. 1-1 at 368–369.) That address reflects Kezirian's own operation of the company from Arizona, (*id.* at 369), not conduct by Reinstein and Ryu directed at Arizona. Moreover, Kezirian describes World College's Arizona ties as "historical" and concedes that Arizona is not its current principal place of business. (Doc. 11 at 6 n.5, 17 n.8).

the June 7 email and the August 8 letter to Williamson, not Cummings, (*id*. at 384–385), and his allegations that the other Director Defendants acted in concert with or ratified those communications are conclusory and describe nothing that Cummings did. Accordingly, as with Reinstein and Ryu, Kezirian has sufficiently alleged only the May 30 meeting and June 2 email as intentional acts by Cummings.[6]

*ii. Expressly aimed*

As discussed above, the June 2 email is connected to Arizona only through Kezirian's residence and its two Arizona recipients, who were among more than ninety worldwide recipients. That connection is insufficient under *Walden* and *Axiom Foods*. Kezirian points to no allegation or evidence that Cummings chose Arizona recipients or directed the email at Arizona. In the FAC, he alleges only that Defendants had "actual, imputed, or constructive knowledge" of who the shareholders of record were. (*Id*. at 370.) Kezirian also argues that Cummings knew that Kezirian lived and worked in Arizona. (Doc. 11 at 10.) Even assuming Cummings knew that Kezirian lived in Arizona and that two of more than ninety recipients lived in Arizona, that shows, at most, awareness that the email would reach forum residents, which differs from aiming at the forum. *Walden*, 571 U.S. at 289; *Axiom Foods*, 874 F.3d at 1070. Cummings's role as the speaker and the sender of the June 2 email therefore does not change the result. The same is true of the other conduct attributed to Cummings. As discussed above, the May 30 meeting is connected to Arizona only through Kezirian's residence.

*iii. Harm suffered in the forum*

With respect to the third element of the purposeful direction test, Kezirian asserts that Cummings knew that Kezirian lived and worked in Arizona. (Doc. 11 at 10.) As explained above, however, that resulted from the independent decisions of third parties, and nothing alleged shows that Cummings, an Irish citizen who lives in Dublin, knew of

---

[6] Likewise, as explained *supra*, Kezirian's conclusory alter-ego allegations regarding World College's Arizona contacts cannot substitute for Cummings's own contacts with Arizona.

PEH or knew that Hammond and Herion were Kezirian's partners in it. (*See* Doc. 12 at 4.) His awareness that Kezirian lived in Arizona shows, at most, foreseeability, which is not enough. *Axiom Foods*, 874 F.3d at 1070. Kezirian has therefore not satisfied the third element as to Cummings.

Because Kezirian has not established specific jurisdiction as to any Movant, the Motions to Dismiss will be granted for lack of personal jurisdiction.

## IV. LEAVE TO AMEND

Rule 15 provides that the "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). As the term "freely" suggests, this "policy is to be applied with extreme liberality." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1102 (9th Cir. 2018) (citation omitted). "Although leave to amend should be given freely, denying leave is not an abuse of discretion if it is clear that granting leave to amend would have been futile." *In re Cloudera, Inc.*, 121 F.4th 1180, 1189–90 (9th Cir. 2024) (citation omitted). Here the jurisdictional defects cannot be cured by amendment. Kezirian had the opportunity to submit additional evidence to support jurisdiction against Movants, but failed to meet his burden. Furthermore, he did not seek leave to amend, and thus did not suggest how amendment could cure the jurisdictional defect. (*See generally* Docs. 11, 18.) Because amendment would be futile, Kezirian will not be granted leave to amend.

## V. CONCLUSION

For the reasons above, the Motion to Strike will be granted, the Cross-Motion will be denied, and the Motions to Dismiss will be granted for lack of personal jurisdiction, without leave to amend.

Accordingly,

**IT IS ORDERED granting** the Motion to Strike (Doc. 15), striking Defendants' Supplement to State Court Record, (Doc. 7), and directing the Clerk to vacate the termination of Defendant Osama Ibrahim and reinstate him on the docket. Ibrahim shall answer or otherwise respond to Kezirian's Complaint by no later than **December 2, 2026**.

///

**IT IS FURTHER ORDERED denying** Defendants' Cross-Motion to adopt the Superior Court's partial dismissal of Ibrahim. (Doc. 17.)

**IT IS FURTHER ORDERED granting** Cummings's Motion to Dismiss, (Doc. 10), and Reinstein and Ryu's Motion to Dismiss, (Doc. 8). The claims against Cummings, Reinstein, and Ryu are dismissed without prejudice and without leave to amend.

Dated this 18th day of November, 2026.

Honorable Sharad H. Desai
United States District Judge